IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : 
: 4:CR-03-0298
v. :
: (Judge McClure)
ANTONIO MCINTOSH, a/k/a "DON" and :
DOMONIQUE HAYNES, a/k/a "BLACK," :
:
Defendants. :

**M E M O R A N D U M**

February 7, 2006

**BACKGROUND:**

Defendants Domonique Haynes and Antonio McIntosh, among others, were charged with various drug offenses[1] by way of superceding indictment dated March 25, 2004.  Haynes and McIntosh stood trial for the charges.  A jury was selected on May 2, 2005, and the trial concluded on May 12, 2005.  On May 12, 2005, both defendants were found guilty on all charges by the jury.  Haynes and McIntosh have now moved for a new trial.

Haynes timely filed his first motion for a new trial on May 18, 2005 (Rec.

---

[1] Along with other coconspirators, Haynes and McIntosh were charged with conspiring to possess with intent to distribute and distributing more than fifty grams each of cocaine and crack cocaine, Schedule II controlled substances, within 1000 feet of a private college or university, public playground, and/or a public housing facility in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), 846, and 860(a). (Superseding Indictment, Rec. Doc. No. 110-1.)

Doc. No. 426) and a supplemental motion for a new trial on May 26, 2005 (Rec. Doc. No. 432).  On August 3, 2005, McIntosh submitted a motion to join Haynes's supplemental motion for a new trial.  (Rec. Doc. No. 457.)  We granted the unopposed motion of McIntosh, construing the challenge as based on "newly discovered evidence" in the form of Brady violations.  (Rec. Doc. No. 458.)  We granted the government's motion to file one consolidated brief in response to the defendants' joint motions.  (Rec. Doc. No. 461.)  McIntosh filed an amended brief in support of his motion for a new trial on October 7, 2005.  (Rec. Doc. No. 472.)  After a series of extensions, the government filed its response and brief in opposition to the defendants' motions for a new trial.  (Rec. Doc. No. 478.)  McIntosh filed a renewed motion for a new trial on January 10, 2006.  (Rec. Doc. No. 488.)  We will consider the defendants' motions together and examine each argument as applicable to both Haynes and McIntosh.

The defendants raise a number of arguments in support of their motions for a new trial.  First, they argue that the government violated the teachings of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny by failing to provide the complete criminal history of government witness Edward Edmonds.  The defendants also argue that the government violated Brady by wholly failing to provide the criminal history of government witness Gene Williams (the defendants were given the

criminal history of a <u>different</u> man named Gene Williams).

Second, Haynes and McIntosh allege violations of their rights under the Confrontation Clause of the Sixth Amendment. Defendants argue that the government's suppression of accurate criminal records for Edmonds and Williams significantly impacted their ability to confront the witnesses against them. They also argue that the court erred by preventing the questioning of government witness Tamirra Smith about unrelated charges pending in state court, and witness Chuck Stine regarding the circumstances of a prior arrest. Finally, Haynes argues that the court erred by denying his request for an additional jury interrogatory concerning the charged conspiracy.

We have refrained from ruling on defendants' motions in the absence of a true and correct copy of the criminal history for Gene Williams. As the government disclosed this information on February 6, 2006, we now have before us all information essential to our ruling. In the following analysis, we explain our decision that the defendants' rights under <u>Brady</u> and the Confrontation Clause were not violated, and that the jury instructions, interrogatories, and verdict slip were proper.

## ANALYSIS:

## I. BRADY CHALLENGES

In the landmark case of Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Since Brady, the Court has held that a prosecutor is required to disclose exculpatory evidence even when the defense has not requested the information. United States v. Agurs, 427 U.S. 97, 107 (1976); United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). The prosecutor's duty to disclose has been clarified to include impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence[] falls within the Brady rule.") (citing Giglio v. United States, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the Brady] rule.")); United States v. Boone, 279 F.3d 163, 189 (3d Cir. 2002) ("The affirmative duty to disclose includes impeachment evidence as well as exculpatory evidence.").

The duty of disclosure under Brady "is not limited to evidence the

4

prosecutor is aware of.  Rather, it includes 'evidence known only to police investigators and not to the prosecutor.'" <u>Smith v. Holtz</u>, 210 F.3d 186, 195 (3d Cir. 2000) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 438 (1995)).  "In the interests of inherent fairness, the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it.  To do otherwise would be inviting and placing a premium on conduct unworthy of representatives of the United States Government." <u>United States v. Perdomo</u>, 929 F.2d 967, 970 (3d Cir. 1991) (quotations and citations omitted).

The Third Circuit has indicated that "the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state." <u>Id.</u> at 971. (citations omitted).  Accordingly, in <u>Perdomo</u>, the Court of Appeals held that criminal background information contained in local police records constituted information "readily available" to the prosecution.  <u>Id.</u>  In that case, the government's failure to search local police records and disclose the criminal history of its principal witness amounted to a suppression of exculpatory evidence, and the Third Circuit noted that the prosecution's "ineffectual attempt to verify a key prosecution witness' criminal history amounted to conduct unworthy of the United States Attorney's Office." <u>Id.</u> at 970-71.

5

The broad duty imposed upon the prosecution is based on the special status of the United States Attorney within the federal system.  Strickler v. Greene, 527 U.S. 263, 281 (1999). "[T]he United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). However, not every violation of the prosecutor's duty to disclose necessarily establishes that the outcome of a proceeding was unjust.  Id.  Nor would a "clerical error" or "administrative mistake," without more, lead to the conclusion that "the government withheld information that was readily available to it or constructively in its possession."  Hollman v. Wilson, 158 F.3d 177, 181 (3d Cir. 1998).

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler, 527 U.S. at 281.

Defendants argue that the government violated Brady and its progeny by failing to provide a complete criminal history for government witness Edward "Eddie" Edmonds.  Defendants further argue that the government's total failure to

6

provide an accurate criminal history for government witness Gene Williams violated

Brady, when the government provided the criminal history of a different man named

Gene Williams.  For the following reasons, we find that the defendants' rights

under Brady were not violated.

*1.  Eddie Edmonds*

Edward "Eddie" Edmonds was an important witness for the government.

Edmonds testified that he lived in an apartment with McIntosh during the summer

of 2003, when Edmonds was seventeen years old and McIntosh was dating

Edmonds's sister.  (See generally Trial Tr. May 4, 2005, morning session, Rec.

Doc. No. 395, at 48-111.)  Edmonds stated that he knew Haynes because Haynes

was friends with McIntosh, and that the two of them were in a gang together.

Edmonds described how Haynes and McIntosh attempted to bail each other out of

jail on separate occasions.  Edmonds testified that he saw a safe in the room that

his sister shared with McIntosh, and that the safe contained drugs, cash, and a gun.

Edmonds also identified photos of McIntosh and others seized from the bedroom

McIntosh shared with Edmonds's sister.

The criminal history provided to defense counsel by the prosecution for

Eddie Edmonds contained references to two arrests.  (See Rec. Doc. No. 432,

attachments.)  On August 25, 2003, Edmonds was arrested in Williamsport,

Pennsylvania for statutory rape, involuntary deviate sexual intercourse, and indecent assault. He was seventeen years old at the time of the arrest.[2] The criminal history record states "DISPOSITION UNREPORTED" next to these offenses. On September 27, 2004, at the age of eighteen, Edmonds was arrested in Muncy, Pennsylvania, this time for theft by unlawful taking, "theft of property lost, etc.," and "criminal attempt/theft by deception." Again, the criminal history record states "DISPOSITION UNREPORTED" next to these offenses.

At trial, counsel for McIntosh attempted to impeach Edmonds with the arrest for statutory rape and involuntary deviate sexual intercourse. (Trial Tr. May 4, 2005, afternoon session, Rec. Doc. No. 393, at 15.) The government objected, and counsel withdrew the objection at sidebar after a determination that the charges had not resulted in conviction. (Id.)

After the trial concluded, a private investigator retained by Haynes discovered that Edmonds had pled guilty to three offenses in the Court of Common Pleas of Lycoming County, Pennsylvania on February 17, 2005. In two separate pleas, Edmonds pled guilty to simple assault, recklessly endangering

---

[2] We note his age only to demonstrate that were he convicted of these offenses as a juvenile, Federal Rule of Evidence 609(d) would have guided our analysis regarding the admissibility of the juvenile adjudication.

another, and the possession of a prohibited offensive weapon.[3]  (See Rec. Doc.

No. 432, attachments.)  Convictions for all three offenses would be admissible to

attack the credibility of Edmonds, because each offense was punishable by

imprisonment in excess of one year.[4]  See Fed. R. Evid. 609(a)(1).

The first component of a true Brady violation has thus been satisfied.  The

fact that Eddie Edmonds had pled guilty to three crimes mere months before

serving as a witness in this trial may have affected the jury's opinion of his

testimony, particularly considering the image projected by Edmonds and endorsed

---

[3]  The Affidavit of Probable Cause resulting in these convictions reveals that Edmonds threatened an individual during a conversation about Christianity and believing in Jesus Christ.  When the other individual stated that he did not believe in Jesus Christ, Edmonds pulled a pocket knife from his pants, held the blade of the knife within a half inch of the individual's throat, and stated, "Pop off at the mouth again and I will slice [your] throat."  (See Rec. Doc. No. 432, attachments.)

[4]  In Pennsylvania, a misdemeanor of the first degree is punishable by a maximum of five years.  18 Pa. C.S.A. § 1104(1).  A misdemeanor of the second degree is punishable by a maximum of two years.  18 Pa. C.S.A. § 1104(2). Possession of a prohibited offensive weapon is a misdemeanor of the first degree. 18 Pa. C.S.A. § 908(a).  Simple assault, 18 Pa. C.S.A. § 2701(b), and reckless endangerment, 18 Pa. C.S.A. § 2705, are misdemeanors of the second degree. Because each offense is punishable by imprisonment in excess of one year under Pennsylvania law, the guilty pleas would be admissible to attack the credibility of Edmonds, so long as the probative value of the impeachment evidence outweighs its prejudicial effect.  See Fed. R. Evid. 609(a)(1).

by the government.[5]  The impeachment material was favorable to the defendants.

The government admits that the criminal history it provided was incomplete, but argues that "[m]aterial easily obtained by the defense cannot be the basis for a Brady violation."  (Rec. Doc. No. 478, at 13.)  We reject the government's contention that it satisfies its burden under Brady and its progeny by failing to provide an accurate criminal history, so long as police records are publicly available for the witness at issue.

Furthermore, the case cited by the government to support its position, Coleman v. Mitchell, 268 F.3d 417, 438 (6th Cir. 2001), is easily distinguishable on its facts.  In Coleman, a petitioner for a writ of habeas corpus argued that the government violated Brady by failing to disclose potentially exculpatory background files and reports concerning petitioner himself.  Id.  Petitioner there argued that the files and reports in the government's possession contained information regarding petitioner's own personal background, and that the information may have proved exculpatory at either the guilt or penalty phase of his

_____

[5]Edmonds referred to himself as "a Christian man" (Trial Tr. May 4, 2005, afternoon session, Rec. Doc. No. 393, at 44), and testified that he found his current apartment with the help of his pastor (Trial Tr. May 4, 2005, morning session, Rec. Doc. No. 395, at 60).  The government emphasized the testimony of Edmonds in its closing argument, noting that the young man has had a tough life and has tried to extricate himself from the scourge of drugs and crime that plagued his family.

murder trial.

The Sixth Circuit held that "[t]he <u>Brady</u> rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue." <u>Id.</u> (citing cases). <u>Coleman</u> is distinguishable because petitioner in that case was aware of the essential facts contained in the government's files because those facts dealt with petitioner's <u>own</u> personal background. Here we are confronted with a situation where the government provided an admittedly incomplete criminal history for a prosecution witness. The reasoning of the Sixth Circuit in <u>Coleman</u> does not apply to the facts of this case. The government's failure to provide a complete criminal history for Eddie Edmonds is unacceptable. <u>See, e.g., Perdomo</u>, 929 F.2d at 970-71.

There is no doubt that the evidence was suppressed; whether the suppression was willful or inadvertent is immaterial. <u>See, e.g., Giglio</u>, 405 U.S. at 154 ("whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). The Third Circuit has squarely held that a prosecutor's failure to learn and disclose a witness's criminal history as contained in local police records was a suppression of evidence. <u>Perdomo</u>, 929 F.2d at 971.

In <u>Perdomo</u>, the district court stated at defendant's sentencing hearing, "If an NCIC check does not demonstrate there was a prior criminal conviction, then let

11

the Third Circuit say that U.S. Attorneys and [the] U.S. Attorney's office has to do more . . . . I'm not going to require that." Id.  In response, the Third Circuit stated, "We view the U.S. Attorney's obligation somewhat differently than did the district court." Id.  Because the prosecution is obligated to produce certain evidence "actually or constructively in its possession or accessible to it," and because "the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state," the Third Circuit held that "the criminal background information contained in local Virgin Islands records was information that was 'readily available' to the prosecution." Id. at 970-71.

The situation in the instant case is similar.  A National Crime Information Center (NCIC) record check for Edmonds did not reveal his most recent Lycoming County arrests.  Nevertheless, because that information would have been helpful to the defense in attacking Edmonds's credibility as a witness, and because the information was in the possession of some arm of the state, the prosecutor is charged with the duty of "learn[ing] and disclos[ing]" that information to the defense.  Id. at 971.

The government admits in its opposition to defendants' motions for a new trial that the local criminal record of Edmonds was "found easily and quickly by the

12

defense's private investigator thanks to Pennyslvania's modern system of record keeping." (Rec. Doc. No. 478, at 15.) But the law places the burden to learn and disclose government witnesses' criminal records on the prosecution. That such records are easily available to a defense private investigator does not relieve the government of its burden. The ease with which the government describes the defense's retrieval of the records does not alleviate our consternation over the government's failure to make an accurate disclosure in the first instance. The second component of a true <u>Brady</u> violation is satisfied.

Having established that the first two components of a true <u>Brady</u> violation have been satisfied, we are left to determine whether the government's failure in this case materially prejudiced the defendants.

In evaluating a <u>Brady</u> claim, the "touchstone on materiality is <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995)." <u>Banks v. Dretke</u>, 540 U.S. 668, 698 (2004); <u>United States v. Mitchell</u>, 365 F.3d 214, 254 (3d Cir. 2004). "<u>Kyles</u> instructed that the materiality standard for <u>Brady</u> claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" <u>Banks</u>, 540 U.S. at 698 (quoting <u>Kyles</u>, 514 U.S. at 435). To thus undermine confidence in the verdict, a defendant must demonstrate a "'reasonable probability of a different result,' had the withheld evidence been

available." <u>Mitchell</u>, 365 F.3d at 254 (quoting <u>Kyles</u>, 514 U.S. at 434).  "This standard is relatively lenient; '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" <u>Id.</u> (quoting <u>Kyles</u>, 514 U.S. at 434).

The question here is whether Edmonds's convictions are material, that is, whether there is a reasonable probability that disclosure of his criminal record would have led to a different result at trial.  Our confidence in the verdict remains intact.  Although Edmonds was an important government witness, he was not the sole government witness.  Other witnesses provided damaging testimony that linked Haynes and McIntosh in a conspiracy to distribute drugs.  Tamirra Smith testified to the drugs and handgun contained in a safe owned by Haynes but transported by Haynes and McIntosh, and to the relationship between Haynes and McIntosh.  (<u>See generally</u> Trial Tr. May 4, 2005, afternoon session, Rec. Doc. No. 393, at 69-148.) She testified about how she transferred the drugs and gun to McIntosh once Haynes was arrested, and how she accompanied McIntosh to retrieve money owed to Haynes by a woman.  She further testified that she had observed both Haynes and McIntosh sell drugs.

Alicia Welch testified that Haynes made three to four trips a week from

Williamsport to Philadelphia and back to transport crack cocaine.  (Trial Tr. May 2, 2005, Rec. Doc. No. 394, at 56.)  Welch also testified that Haynes had a safe with drugs, cash and a handgun inside.  Law enforcement officers testified to the drugs and weapons found at a search of McIntosh's apartment and the circumstances surrounding Haynes's arrest, and corroborated testimony regarding controlled buys by informants Chuck Stine and Marguerita Lee.  Gene Williams testified at length about drugs and weapons in McIntosh's safe, a trip to New York where McIntosh bought crack cocaine, and other dealings with Haynes and McIntosh.  (See generally Trial Tr. May 5, 2005, morning session, Rec. Doc. No. 397, at 50-111.) Williams also testified that McIntosh was affiliated with a gang.

Finally, it is worth noting that none of the crimes to which Edmonds pled guilty was crimen falsi.  The crimes of simple assault, recklessly endangering another, and possession of a prohibited offensive weapon do not involve dishonesty or false statement.  See generally Com. Ex rel. Baldwin v. Richard, 751 A.2d 647, 653 (Pa. 2000) (defendant's conviction for reckless endangerment, after holding his former girlfriend at gunpoint for three hours in a parked car, was not a crimen falsi offense); Allen v. Kaplan, 653 A.2d 1249, 1253 (Pa. Super. 1995) ("Pennsylvania courts have indicated that perjury, bribery, burglary, criminal trespass, larceny, theft, retail theft, unauthorized use of a motor vehicle, and theft

by receiving stolen property are crimes involving dishonesty or false statement.

Conversely, . . . aggravated assault . . . and assault with intent to kill and murder do

not constitute crimes of dishonesty or false statement."). The value of Edmonds's

convictions for impeachment purposes would therefore have been minimal.

Although we are troubled by the government's failure to provide defendants

with the complete criminal history for Eddie Edmonds, we conclude that even had

defense counsel been provided with Edmonds's full record, such impeachment

material would not have put the whole case in such a different light as to undermine

our confidence in the verdict. The defendants have not demonstrated a

"'reasonable probability of a different result,' had the withheld evidence been

available." Mitchell, 365 F.3d at 254 (quoting Kyles, 514 U.S. at 434). "[T]he

Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware

v. Van Arsdall, 475 U.S. 673, 681 (1986). While this trial may not have been

perfect, it was fair, and our confidence in the verdict is unshaken. With respect to

Eddie Edmonds, the material withheld by the government constituted Brady

material, but there was no true Brady violation.

## 2. *Gene Williams*

Gene Williams, a former crack addict turned informant, testified at length

regarding his dealings with McIntosh and Haynes. (See generally Trial Tr. May 5,

2005, morning session, Rec. Doc. No. 397, at 50-111.)  He recounted numerous

buys from McIntosh, and described the fateful trip to New York City resulting in

the arrest of McIntosh, Tamirra Smith, Tammy Williams (Gene Williams's wife),

and Gene Williams himself.

In accordance with its responsibilities under the Jencks Act and <u>Brady</u>, the

government supplied defense counsel with various materials on April 25, 2005.

Among those materials was the purported rap sheet of Gene Williams.  The

criminal history was for one Eugene Williams, apparently born November 22, 1965.

(<u>See</u> Government's Disclosure dated Jan. 6, 2006.)  This history revealed that

Eugene Williams had various convictions for drug offenses, burglary, and weapons

offenses.  However, the man who testified against Domonique Haynes and Antonio

McIntosh is Gene Holman Williams, born February 27, 1964.  (<u>See</u> Trial Tr. May

5, 2005, morning session, Rec. Doc. No. 397, at 50; Government's Disclosure

dated Jan. 25, 2006.)  The government provided the criminal history of the wrong

man.

Armed with an incorrect criminal history, defense counsel attempted to

impeach the witness Gene Holman Williams with convictions from Oklahoma and

Orange County, California, places the witness had never visited.  (Trial Tr. May 5,

2005, afternoon session, Rec. Doc. No. 398, at 4-5.)  The court, in its reliance on

17

the incorrect criminal history, instructed the jury that "Gene Williams . . . may be considered as [a] prior felon[] in this case."  (Rec. Doc. No. 413, at 14.)

In their motions for a new trial, defense counsel brought the matter to the court's attention for the first time.  On December 21, 2005, we ordered the government to produce a true, correct and complete copy of the criminal history of the Gene Williams who testified at the trial of Domonique Haynes and Antonio McIntosh no later than January 5, 2006.  (Order, Rec. Doc. No. 487.)

The United States Attorney's Office did not meet this deadline.  At the close of business on Friday, January 6, 2006, the government did provide the court with a copy of the criminal history of Eugene Williams.  This submission was the exact same criminal history the government had provided to defense counsel in April, 2005.  We therefore ordered that the government had until 5:00 p.m. on January 25, 2006, to deliver a true, correct and complete copy of the criminal history of the Gene Williams who testified at this trial.  (Rec. Doc. No. 489.)  We further noted that failure of the government to comply with the order without just cause may cause the court to draw an inference adverse to the government in its analysis of defendants' motions for a new trial.  (Id.)

On January 25, 2006, the government provided what it believed to be the proper arrest record for Gene Holman Williams.  The defendants objected, noting

18

that the "the criminal history provided . . . does not appear to be an NCIC report, but rather a CLEAN [Commonwealth Law Enforcement Assistance Network] report which searches only the Pennsylvania Computerized Criminal History file." (Rec. Doc. No. 493-1, at 2.)  Defendant Haynes further stated that he had reason to believe that Williams has faced criminal charges in New Jersey and the Commonwealth of Virginia.  (Id.)

Accordingly, on February 2, 2006, we ordered the government to produce the criminal history of Gene Holman Williams, as contained in an NCIC report. (Order, Rec. Doc. No. 494.)  On February 6, 2006, the government provided the criminal history of Gene Holman Williams, as run by the Scranton field office of the United States Drug Enforcement Administration.  (Rec. Doc. No. 495, at 1.)  The Assistant United States Attorney informed the court that this history accessed the NCIC database, AFIS (Automated Fingerprint Identification Systems), and Nlets (National Law Enforcement Telecommunications System), the international justice and public safety information sharing network.  (Id. at 2.)  Our review of this submission confirms that it is the correct criminal history for the witness who testified at this trial, and it appears to be complete.[6]

_____

[6]The criminal history does indicate that Williams was arrested in New Jersey on June 20, 2003, but that the drug charges were dismissed.  (Rec. Doc. No. 495,

Defendants argue that the government's failure to provide this correct history before Williams's testimony was a violation of <u>Brady</u> and its progeny.  We disagree because even had defense counsel been provided with this additional impeachment evidence, it would not have put the whole case in such a different light as to undermine our confidence in the verdict.  Although the first and second components of a true <u>Brady</u> violation are satisfied here, the third component is not.

The impeachment evidence is favorable to the defendants.  Even though the correct record for the witness Gene Williams reveals convictions for crimes less serious than those committed by the unrelated Eugene Williams, it would undoubtedly aid the defense to have the correct criminal record so as to impeach the witness with accurate information.  The first component of a true <u>Brady</u> violation is thus satisfied.

The second component is also satisfied because the evidence was suppressed.  In <u>Hollman</u>, the Third Circuit held that where a clerical error caused the prosecution to provide defense counsel with an incorrect and incomplete criminal record, the court could not conclude that the government withheld information readily available to it or constructively in its possession.  158 F.3d at

---

attachment at 2.)

181.  The witness in <u>Hollman</u> had accidentally been given two different

identification numbers in the police computer system, and as a result, the record

retrieved by the government did not contain significant aspects of the witness's

criminal history.  <u>Id.</u> at 179.

We do not believe that <u>Hollman</u> controls this issue, however.  The facts in

<u>Hollman</u> were unique and in that case, "the cause of the failure [was] characterized

by the parties as an administrative mistake."  <u>Id.</u> at 181.  We refuse to hold that the

government's duty under <u>Brady</u> is satisfied by providing a criminal history for a

person with the same name as the government witness.  The government has at its

disposal other simple avenues of confirming that the correct history is provided to

the defense, including confirmation using social security numbers or birthdates.

The government's failure in this case to locate and provide the correct criminal

history constituted suppression of evidence, and satisfies the second component of

a true <u>Brady</u> violation.[7]

_____

[7]The prosecution is accountable for information in the possession of some
arm of the state.  <u>Perdomo</u>, 929 F.2d at 971.  This duty "rests on the notion that
government failure to turn over an easily turned rock is essentially as offensive as
one based on government non-disclosure."  <u>Hollman</u>, 158 F.3d at 181.  The
prosecutor has a duty to confirm that accurate information is provided to the
defense.  It was not clerical error, as was the case in <u>Hollman</u>, but rather a failure to
confirm the accuracy of the record check, that resulted in the government's errant
disclosure here.

Nevertheless, we find that even had defense counsel been provided with Williams's true criminal record, this evidence would not have put the whole case in such a different light as to undermine our confidence in the verdict.

Two lines of reasoning support this conclusion.  First, as detailed in our discussion regarding Edmonds, the government presented extensive evidence regarding the illegal activities of Haynes and McIntosh.  Much of Williams's testimony was corroborated by other witnesses.  The impeachment material contained in his correct criminal record would not have influenced the jury's verdict.

Secondly, Williams testified on <u>direct</u> examination to the fact that he committed every crime contained in his true criminal history.  The correct criminal history indicates that Gene Williams has pled guilty to three charges of retail theft and one charge of forgery.[8]  (<u>See</u> Government's Disclosure dated February 6, 2006, Rec. Doc. No. 495, attachment at 11, 12, 15, 18.)  On direct examination, Williams testified that he supported his addiction to crack cocaine through "retail

---

[8]Williams's criminal history also contains numerous charges that did not result in conviction.  These charges do not constitute proper impeachment material. <u>See</u> Fed. R. Evid. 609(a).  Other charges, some of which resulted in conviction, are inadmissible because more than ten years have elapsed since the date of conviction or release from confinement.  <u>See</u> Fed. R. Evid. 609(b).

theft, other crimes . . . working for other drug dealers, stuff like that."  (Rec. Doc.

No. 397, at 51.)  Williams also testified that he traded "stuff like VCR, CD players,

TVS, computers" to McIntosh in return for drugs.  (Id. at 56.)  When asked where

he obtained those items, Williams stated: "From other people, or things that I might

have taken."  (Id.)  Finally, Williams testified that he was imprisoned "[f]or burglary

and forgery charges."  (Id. at 80.)

Thus, every conviction contained in the correct criminal record was actually

elicited on direct examination.  Defense counsel was free to cross-examine Williams

on his direct testimony regarding retail theft, burglary, forgery, and working for

other drug dealers, but failed to do so.  The jury heard from Williams that he had

committed those crimes.  Furthermore, the court instructed the jury to consider

Gene Williams to be a felon.[9]

Based on the foregoing analysis, we conclude that the government's failure

to provide the correct criminal history did not violate defendants' rights under

Brady.  The impeachment evidence does not shake our confidence in the verdict.

We do note, however, our disquiet with the government's failures in this case,

---

[9]The court instructed the jury that Gene Williams was a felon, an informant, and an accomplice, and that such statuses are properly considered in making credibility determinations.  (Rec. Doc. No. 413, at 14-15.)

including its failure to timely provide the correct criminal history of Gene Williams

when specifically ordered by the court.

## II. CONFRONTATION CLAUSE CHALLENGES

Defendants have also alleged violations of their rights under the

Confrontation Clause.  The Confrontation Clause of the Sixth Amendment to the

United States Constitution guarantees the right of an accused in a criminal

prosecution "to be confronted with the witnesses against him."  U.S. Const.

amend. VI.  The Supreme Court of the United States has recognized "that the

exposure of a witness' motivation in testifying is a proper and important function of

the constitutionally protected right of cross-examination."  Delaware v. Van Arsdall,

475 U.S. 673, 678-79 (1986) (quoting Alaska v. Davis, 415 U.S. 308, 316-17

(1974)).  However, "the Confrontation Clause guarantees an opportunity for

effective cross-examination, not cross-examination that is effective in whatever

way, and to whatever extent, the defense might wish."  Id. (quoting Delaware v.

Fensterer, 474 U.S. 15, 20 (1985) (per curiam)).

"[A] criminal defendant states a violation of the Confrontation Clause by

showing that he was prohibited from engaging in otherwise appropriate cross-

examination designed to show a prototypical form of bias on the part of the

witness, and thereby 'to expose to the jury the facts from which jurors . . . could

24

appropriately draw inferences relating to the reliability of the witness.'" <u>Id.</u> (quoting

<u>Davis</u>, 415 U.S. at 318).  Even were there to be a violation of the Confrontation

Clause, a reviewing court would engage in a harmless error analysis guided by <u>Van

Arsdall</u> and <u>Chapman v. California</u>, 386 U.S. 18 (1967).  In <u>Van Arsdall</u>, the

Supreme Court held that:

> the constitutionally improper denial of a defendant's
> opportunity to impeach a witness for bias, like other
> Confrontation Clause errors, is subject to Chapman
> harmless-error analysis.  The correct inquiry is whether,
> assuming that the damaging potential of the cross-
> examination were fully realized, a reviewing court might
> nonetheless say that the error was harmless
> beyond a reasonable doubt.  Whether such an error is
> harmless in a particular case depends upon a host of
> factors . . . . includ[ing] the importance of the witness'
> testimony in the prosecution's case, whether the
> testimony was cumulative, the presence or absence of
> evidence corroborating or contradicting the testimony
> of the witness on material points, the extent of cross-
> examination otherwise permitted, and, of course, the
> overall strength of the prosecution's case.

475 U.S. at 684.

In this case, defendants have alleged violations of the Confrontation Clause

with respect to the testimony of Eddie Edmonds, Gene Williams, Tamirra Smith

and Chuck Stine.  The government failed to address these challenges in its brief in

opposition.

As indicated above, we apply a two-step analysis to the Confrontation Clause challenge.  First, we determine whether the defendants were prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of each witness.  Id. at 678-79.  Second, if we find an error under the Confrontation Clause, we must determine whether the error was harmless beyond a reasonable doubt.  Id. at 684.

*1.  Eddie Edmonds and Gene Williams*

A defendant demonstrates a violation of his rights under the Confrontation Clause by "showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness."   Van Arsdall, 475 U.S. at 678-79.  Defendants here argue that "[e]xposure to criminal charges (or other criminal justice system control) can create significant bias of a witness in favor of the government," and cite as support the Supreme Court decisions in Davis v. Alaska and Van Arsdall.  (Rec. Doc. No. 472.)  However, no case cited by defendants holds that the inability of a defendant to impeach the general credibility of a prosecution witness with prior unrelated criminal convictions is a violation of the Confrontation Clause.

One case cited by defendants is Boggs v. Collins, 226 F.3d 728 (6th Cir. 2000).  In that case, the Sixth Circuit discusses Davis and Van Arsdall:

26

In <u>Van Arsdall</u>, the Court emphasized that <u>Davis</u> and prior decisions recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." It then elaborated that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to <u>show a prototypical form of bias on the part of the witness</u>." The Court therefore criticized the trial court's refusal to allow Van Arsdall to cross-examine a key prosecution witness about the fact that charges of public drunkenness had been dismissed in exchange for his testimony. This limitation foreclosed investigation into an event "that a jury might reasonably have found [to have] furnished the witness a motive for favoring the prosecution in his testimony," and therefore violated the Confrontation Clause. Courts after <u>Davis</u> and <u>Van Arsdall</u> have adhered to the distinction drawn by those cases and by Justice Stewart in his concurrence–that cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not.

<u>Id.</u> at 737 (citations omitted) (emphasis original).

Neither Edmonds nor Williams had criminal charges pending against him at the time of his testimony, nor were any charges dropped in exchange for either's testimony. Defendants essentially argue that their right to confront Edmonds and Williams was abridged by an inability to impeach their general credibility with prior unrelated criminal convictions. This is not a right protected by the Confrontation

Clause.

Even if the defendants' rights under the Confrontation Clause were violated, such a violation would be subject to a harmless error analysis.  Van Arsdall, 475 U.S. at 684.  We find that any error under the Confrontation Clause would be harmless beyond a reasonable doubt.  In this determination, we are called upon to consider various factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  Id.

As discussed above in our analysis of defendants' Brady claims, the prosecution presented enough evidence from different witnesses to sustain our confidence in the verdict.  Much of the testimony of Edmonds and Williams was cumulative of other testimony.  Furthermore, as far as Gene Williams is concerned, all of the information contained in the correct criminal history came out on direct.  The defense could have explored statements by Williams that he committed retail theft, burglary, forgery and other crimes, but failed to do so.  The jury was also instructed that Williams was a felon, and that such a status was a permissible part of their credibility determination.  Although it is true that both Edmonds and

Williams were important witnesses for the government, it cannot be said that defendants' convictions rested on their testimony alone, either individually or cumulatively.  We do not find a violation of the defendants' rights under the Confrontation Clause; however, if there were any such violation, we find that it was harmless beyond a reasonable doubt.

*2.  Tamirra Smith*

The defendants argue that the court's evidentiary ruling with respect to the cross-examination of Tamirra Smith significantly inhibited the defendants' right to confront her as a witness against them.  At trial, defense counsel attempted to cross-examine Smith about drug and child endangerment charges pending against her in state court.  After an objection by the government, the court ruled from the bench that the defense was prohibited from asking Smith about the state charges. As our following analysis indicates, the state charges were not proper impeachment material, and there was no violation of the Confrontation Clause.

Tamirra Smith was "a very important witness" because her testimony directly linked Domonique Haynes to Antonio McIntosh.  (Closing Stmt. of Counsel for Haynes, Trial Tr. May 11, 2005, morning session, Rec. Doc. No. 409, at 6, 22-23); (McIntosh's Am. Brief in Support of Mot. for a New Trial, Rec. Doc. No. 472, at 10) (Smith "drew a tight conspiratorial connection between McIntosh and

Haynes").  She testified about a trip to New York City with McIntosh to buy cocaine, and testified that she saw McIntosh sell drugs.  (See generally Trial Tr. May 4, 2005, afternoon session, Rec. Doc. No. 393, at 69-148.)  Smith also stated that McIntosh and Haynes transported a safe to McIntosh's house, and when Haynes was arrested, Smith testified that she removed drugs and a gun from the safe and gave them to McIntosh.

Smith was originally a co-defendant of Haynes and McIntosh, but testified against them pursuant to a plea agreement.  After entering into the plea agreement, but before testifying in this case, Smith was apparently charged in Lackawanna County with various drug crimes and endangering the welfare of a child.  At the time of her testimony, Smith had not been convicted of any of those state charges.

The defendants were prohibited from inquiring about the state charges at trial

pursuant to Federal Rule of Evidence 608(b).[10]   While Rule 609 permits the

impeachment of witnesses by evidence of <u>conviction</u> of a crime under prescribed

circumstances, no Rule permits impeachment by <u>charges</u> or <u>arrests</u>.   Even before

the Federal Rules of Evidence were promulgated, the Supreme Court of the United

States recognized that a witness could not be impeached with a prior arrest that did

not result in a conviction.   <u>See</u> <u>Michelson v. United States</u>, 335 U.S. 469, 482

(1948) (Jackson, J.) ("Arrest without more does not, in law any more than in

reason, impeach the integrity or impair the credibility of a witness.   It happens to

the innocent as well as the guilty.   Only a conviction, therefore, may be inquired

about to undermine the trustworthiness of a witness.")   Under Rule 608, the trial

court does have the discretion to permit the impeachment of a witness with specific

---

[10]Federal Rule of Evidence 608(b) provides in relevant part:

> "Specific instances of the conduct of a witness, for the
> purpose of attacking or supporting the witness'
> character for truthfulness, other than conviction of
> crime as provided in rule 609, may not be proved by
> extrinsic evidence.   They may, however, in the
> discretion of the court, if probative of truthfulness or
> untruthfulness, be inquired into on cross-examination of
> the witness (1) concerning the witness' character for
> truthfulness or untruthfulness . . . ."

instances of unconvicted conduct, but only to the extent that such conduct is probative of the witnesses's character for truthfulness or untruthfulness.  <u>See</u> Fed. R. Evid. 608(b); <u>see, e.g.</u>, <u>United States v. Walker</u>, 47 F. App'x 639, 642 (4th Cir. 2002).

The Third Circuit has stated that "crimes which touch on the honesty of the witness" involve, or at least relate to, "communicative, often verbal dishonesty." <u>Walker v. Horn</u>, 385 F.3d 321, 334 (3d Cir. 2004) (discussing the term <u>crimen falsi</u> in relation to Rule 609).  Such crimes would include "perjury, criminal fraud, embezzlement, false pretense or any other offense the commission of which involves some element of untruthfulness, or falsification bearing on the [witness's] propensity to testify truthfully." <u>Id.</u> We find no difficulty in applying this analysis to the language of Rule 608 requiring that a specific instance of conduct be "probative of truthfulness or untruthfulness" before it may be used to impeach.[11]

We conclude that the fact that Smith had been charged with drug offenses has no bearing on her character for truthfulness.  <u>See, e.g.</u>, <u>Walker</u>, 47 F. App'x at 642 (drug dealing is not the type of conduct that necessarily bears on a witness's

---

[11] In fact, Wright and Gold suggest that "it may make sense to demand a closer connection to truthfulness or untruthfulness from evidence offered under Rule 608" than Rule 609.  <u>See</u> Charles Alan Wright & Victor James Gold, <u>Federal Practice and Procedure</u> § 6118, at n.50 (1993).

character for truthfulness); United States v. Bentley, 706 F.2d 1498, 1510 (8th Cir. 1983) (indictment charging involvement in drug operation not indicative of character for untruthfulness under Rule 608 and could not be used to impeach); Crimm v. Missouri Pac. R. Co., 750 F.2d 703, 707-08 (8th Cir. 1984) (involvement in illegal drug use or transactions, without more, not indicative of character for untruthfulness); United States v. Reed, 700 F.2d 638, 644 (11th Cir. 1983) (possession of drugs sheds no light on a person's character for untruthfulness).

Likewise, the charge of child endangerment does not implicate Smith's veracity as a witness. Cf. United States v. McHorse, 179 F.3d 889, 901 (10th Cir. 1999) (questioning regarding witness's alleged molestation of daughter and half-sister was unrelated to his veracity as a witness and therefore not admissible under Rule 608). Whether Smith was involved with drugs or endangered the welfare of a child does not indicate one way or the other that her testimony was worthy of belief or warranted skepticism. We believe our discretionary decision to exclude testimony regarding the state court charges was correct.

The defendants nevertheless argue that they were denied the opportunity to conduct an effective cross-examination of Smith. McIntosh argues that Rule 611(b) permits cross-examination on "all 'matters affecting the credibility of the witness.'" (Rec. Doc. No. 472, at 27) (emphasis added). McIntosh's reliance on

33

Rule 611(b) is misplaced.  Rule 611(b) merely refers to the <u>scope</u> of cross-examination, and requires that such examination "be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."  Fed. R. Evid. 611(b).  This rule does <u>not</u> authorize cross-examination on <u>all</u> matters affecting the credibility of a witness, as McIntosh argues.  Rather, Rule 611(b) sets the general framework for the proper form of cross-examination, and other provisions (<u>i.e.</u>, Rules 607, 608, 609 and 610) provide the <u>specific</u> rules regarding cross-examination and impeachment.  As discussed above, no rule authorized the impeachment of Smith based on the pending state charges.

The defendants also argue that Smith may have been biased to testify in favor of the prosecution because the federal government may have interceded on her behalf regarding the pending state charges.  However, the Assistant United States Attorney represents in his opposition that "there was never any contact between the government and the Lackawanna County district attorney regarding the charges" (Rec. Doc. No. 478, at 17), and Haynes states that "the Prosecutor proffered that he had advised Ms. Smith's attorney that he would not intercede on her behalf with the County District Attorney" (Rec. Doc. No. 440, at 14).  But McIntosh asserts in his brief that the Assistant United States Attorney "intervened on Smith's behalf by 'call[ing] the ADA to see if [he] could do anything about

those charges, because [he] did not want her arrested coming here.'" (Rec. Doc.

No. 472, at 12 (quoting Trial Tr. at 116, May 4, 2005 afternoon, Rec. Doc. No.

393).)

McIntosh's argument is a distortion of the record.  Defense counsel

attempted to question Smith about the pending charges.  Counsel for the

government objected, and a sidebar ensued.  (See Trial Tr. May 4, 2005, afternoon

session, Rec. Doc. No. 393, at 113-20.)  Defense counsel informed the court that

his private investigator had uncovered the pending state charges against Smith.

When questioned by the court regarding the state charges, the AUSA stated that he

attempted to contact the Assistant District Attorney in Lackawanna County to

ensure that Smith was not arrested on her way to testify in the instant criminal case,

but that no one answered his call.  As a result, the AUSA never spoke with anyone

in the District Attorney's office.  The court directly asked the AUSA: "Have you

made any representation to this witness that, depending upon her testimony, you

would be helpful with respect to the Lackawanna County charges?"  (Id. at 117.)

The AUSA replied, "I told her I can't do anything for her in Lackawanna County."

(Id.)

It is clear from the record that the government did not promise anything to

Smith regarding the pending state charges.  Furthermore, the AUSA flatly told

35

Smith that she would receive no help from the government on those charges.  To

allow the defense to question the witness regarding the state charges would have

resulted in a confusion of the issues and would have detracted from the main focus

of the proceedings.  The defendants were allowed to question Smith regarding her

plea agreement with the government and elicit any motivation or bias that would

arise from that arrangement.[12]  The defendants were thus able to effectively cross-

examine Smith regarding any bias in favor of the government.  See United States v.

McNeill, 887 F.2d 448, 453 (3d Cir. 1989) (where district court permitted cross-

examination of witness regarding plea agreement with the government, but excluded

other evidence pursuant to Rule 608, "[t]he jury was in possession of sufficient

information to make a discriminating appraisal of [the witness's] possible motives

for testifying falsely in favor of the government").[13]

---

[12]  Furthermore, in its final instructions to the jury, the court specifically
mentioned that Tamirra Smith may be considered both an accomplice and an
immunized witness.  (Rec. Doc. No. 413, at 15-16.)  Accordingly, the court
instructed the jury that it must examine and weigh her testimony with greater care
than the testimony of a witness who neither participated in the commission of the
alleged crimes nor had the need for an agreement with the government.  (Id.)

[13]  It is also noteworthy that trial counsel for Haynes vaguely referenced
Tamirra Smith's legal difficulties with the Commonwealth of Pennsylvania in his
closing argument.  Counsel stated that "there may be problems with the conditions
of [Smith's] release, which means she could be arrested and imprisoned at any time
for violating those conditions," a factor that counsel argued "makes it even more
important for her to please [the Assistant United States Attorney]."  (Closing Stmt.

In conclusion, no rule authorized the impeachment of Smith with the pending state charges.  Nothing whatsoever indicates that the government made any representation to Smith that it would aid her with the state charges if her testimony were favorable.  Because defendants were not "prohibited from engaging in otherwise appropriate cross-examination," <u>Van Arsdall</u>, 475 U.S. at 678-79, there was no error in our decision to prohibit the questioning of Smith regarding the pending state charges.

*3.  Chuck Stine*

Chuck Stine was a confidential informant for Pennsylvania State Trooper James Wool, a member of the Lycoming County Drug Task Force.  Stine testified about buying crack cocaine from McIntosh, and Wool testified about a controlled buy of crack cocaine from McIntosh undertaken by Stine.  Defendants complain that their rights under the Confrontation Clause were violated because they were not allowed to delve into the details surrounding the arrest of Chuck Stine.  This is simply not the case.

Stine himself testified on direct examination that he worked as a confidential informant because he had been arrested and charged with delivery, conspiracy, and

_____

of Counsel for Haynes, Trial Tr. May 11, 2005, morning session, Rec. Doc. No. 409, at 27.)

possession of crack cocaine.  (Trial Tr. at 16, May 4, 2005 morning, Rec. Doc. No. 395).  The cross-examination of Stine by trial counsel for McIntosh did go into the details of Stine's arrest.  (Id. at 20-21.)  In fact, defense counsel asked thirteen consecutive questions of Stine regarding his arrest, without objection, and elicited the details of that arrest, including the nature of the state charges, where and when the offense occurred, the quantity of cocaine involved, the sentence served, whether Stine had been induced to testify by the offer of a reduced sentence, and Stine's status as a parolee.  (See id.)

While it is true that the court sustained the government's objection to defense questioning of Trooper Wool regarding Stine's arrest (Trial Tr. May 9, 2005, Rec. Doc. No. 403, at 35), defense counsel had already extracted these details from Stine himself.  Furthermore, Trooper Wool did testify that he had arrested Stine for possession of crack cocaine and drug paraphernalia.  (Id.)  There was no violation of defendants' rights under the Confrontation Clause by excluding testimony that was outside the scope of direct examination and would have constituted the needless presentation of cumulative evidence.[14]

---

[14] We also note that the court instructed the jury that Chuck Stine, among others, could be considered as a prior felon.  (Rec. Doc. No. 413, at 14.)  The court further stated that Stine was an informant, and that "[t]he jury must determine whether each informant's testimony has been affected by self interest, by any

38

### III.  HAYNES'S OBJECTION TO THE JURY INSTRUCTIONS

In his brief in support of motion for a new trial, Haynes argues that the court committed error by denying his request for an additional jury interrogatory that would permit the jury to find a conspiracy between Haynes and Tamirra Smith, either in addition to or instead of between Haynes and McIntosh.  (Rec. Doc. No. 440, at 15.)  Counsel made the request for an additional interrogatory after the court had charged the jury, but before the jury had retired.

Counsel for Haynes candidly admits that "the defendant's request was obviously late in the game" and that counsel is now "unsure of the exact legal basis of this argument."  (Id. at 16-17.)  The United States responds by arguing that Haynes's proposed interrogatory was superfluous and could have confused the jury.

We note as an initial matter that before the court charged the jury, trial counsel for both defendants informed the court that the verdict slip was acceptable. (Trial Tr. at 9, May 11, 2005 morning, Rec. Doc. No. 410.)

Federal Rule of Criminal Procedure 30(d) provides that "[a] party who

---

agreement he or she has with the government, by his or her own interest in the outcome of this case, or by prejudice against one or more defendants.  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."  (Id. at 15.)

objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Failure to present a timely objection will preclude appellate review, unless the matter constitutes a plain error affecting substantial rights. Id.; Fed. R. Crim. P. 52(b).

Defendant Haynes preserved his objection because he raised it before the jury retired to deliberate. We therefore address the merits of Haynes's argument.

Before the jury retired, Haynes argued that the jury should have been allowed to find a separate conspiracy from the one charged in the indictment, which named Haynes as one of seven coconspirators. Haynes further requested that the jury should have been permitted to attribute a separate quantity of drugs to the separate conspiracy. The court overruled the objection, noting that only one conspiracy had been charged.

Haynes cites two cases in his brief that neither address nor lend support to his argument. See United States v. Valencia, 55 F. App'x 264 (6th Cir. 2003) (affirming district court decision denying defendant's request to alter proposed verdict form and finding that defendant neither requested a lesser included offense instruction nor objected to the jury instructions given by district court); United States v. Barrett, 870 F.2d 953 (3d Cir. 1989) (finding reversible error where district

40

court called jury back to issue a lesser included offense instruction, which rendered the verdict ambiguous).

The verdict slip issued by the court essentially accomplished what Haynes sought to do through his proposed additional interrogatory.  As to Count I (conspiracy with intent to distribute and/or distribute cocaine base), the jury had to check either "Guilty" or "Not Guilty" for each defendant, McIntosh and Haynes. (Rec. Doc. No. 417, at 1.)  Jury Interrogatory No. 1 for Count I required the jury to determine the quantity of crack cocaine involved: fifty grams or more, between five and fifty grams, or less than five grams.  (Id.)  If the jury found that Haynes was not involved in a conspiracy, it could have checked "Not Guilty."  Similarly, the jury was free to choose between three options for the quantity of cocaine involved. Haynes's proposed interrogatory was a vehicle to enable the jury to find that Haynes did not conspire with McIntosh, and that Haynes was involved with less than fifty grams of crack.  As the proposed interrogatory was merely a different way of stating the extant content of the verdict slip, it was superfluous.

While the use of special interrogatories to determine the scope of certain conspiracies is permissible, see, e.g., United States v. Desmond, 670 F.2d 414, 418 (3d Cir. 1982), the court's decision whether to issue a special interrogatory is discretionary, see, e.g., Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 371 (3d

Cir. 2004); In re Merritt Logan, Inc., 901 F.2d 349, 367-68 (3d Cir. 1990) (judge

has considerable discretion in framing special interrogatories, so long as they

present the case fairly).  Our discretionary decision with regard to the jury

instructions presented the issues fairly to the jury, and Haynes's motion will be

denied.

## IV.  McINTOSH'S CHALLENGE TO THE SCHOOL ZONE VERDICTS

In his amended brief in support of his motion for a new trial, McIntosh

moved the court to set aside the school zone verdicts as based on insufficient

evidence.  (Rec. Doc. No. 472, at 27-29.)  In his reply to the government's

opposition, current counsel for McIntosh concedes that this argument was not

raised in a timely manner due to trial counsel's failure to file an initial motion for a

new trial within the seven-day time period.  (Rec. Doc. No. 482, at 2 n.2.)

Accordingly, this motion will be denied.

## CONCLUSION:

For the foregoing reasons, the defendants' motions for a new trial will be

denied.

                                    s/ James F. McClure, Jr.
                              James F. McClure, Jr.
                              United States District Court

42

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 4:CR-03-0298 |
| v. | : | |
| | : | (Judge McClure) |
| ANTONIO MCINTOSH, a/k/a "DON" and | : | |
| DOMONIQUE HAYNES, a/k/a "EBONY," | : | |
| | : | |
| Defendants. | : | |

# O R D E R

February 7, 2006

For the reasons set forth in the accompanying memorandum, IT IS

HEREBY ORDERED THAT:

1.     Defendant Domonique Haynes's Supplemental Motion For A New

   Trial, in which Antonio McIntosh joined, is denied.  (Rec. Doc. No.

   432.)

2.     Antonio McIntosh's Renewed Motion For A New Trial is denied.

   (Rec. Doc. No. 488.)


       s/ James F. McClure, Jr.
       James F. McClure, Jr.
       United States District Judge